IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

EASTERN DISTRICT—PHILADELPHIA, 1890.

## R. D. WOOD, ET AL. v. R. J. MALONE, ET. AL.

APPEAL BY DEFENDANTS FROM THE COURT OF COMMON
PLEAS NO. 4 OF PHILADELPHIA COUNTY.

Argued January 15, 1889—Decided January 6, 1890.
[To be reported.]

(*a*) The defendants being contractors for the construction of a city sewer, the plaintiffs engaged to make and furnish the pipe required therefor. By plaintiffs' testimony the pipe was to be shipped by canal, should navigation be open when the pieces were completed; otherwise, by the Pennsylvania railroad. By defendants' testimony, the plaintiffs contracted absolutely to deliver by canal before navigation closed.

(*b*) On November 12th, after the contract was made, the plaintiffs, in response to a request for information, wrote that they would commence shipping about December 1st, by lighter, and complete the delivery by Christmas. The first shipment, however, was not made until December 23d. Navigation then closed, and under instructions from the defendants the succeeding shipments were made by the Reading railroad.

(*c*) In an action for the contract price of the pipe, the defendants sought to recoup expenses incurred by them in consequence of the later shipments being made by rail instead of by water, claiming that their direction to ship by the Reading railroad was not a waiver of their rights, being given after shipments by water had been made impossible by the plaintiffs' delay:

1. The letter of November 12th, not being a part of the contract, but merely an expression of plaintiffs' expectations, evidence for the plaint-

(554)

iffs was properly admitted which tended to show that the reason why those expectations were not realized was that delays were caused by the discovery of defects in the specifications furnished by the city engineer, under which the plaintiffs were to work.

(*d*) The court instructed the jury, inter alia, that if the contract of plaintiffs was to deliver by water and by water only, and the plaintiffs by their own fault, and not by reason of something that was beyond their control, failed to deliver in that way, and thereby the defendants were put to expense and suffered loss, that loss should be set off against the plaintiffs' claim:

2. While perhaps not technically accurate, standing by itself and applied to a contract in which time was expressly made material, this instruction was not reversible error, because not appearing to be so applicable, when considered with reference to the entire charge, and no request having been made for specific instructions as to what would excuse performance of such a contract.

3. Instructions that plaintiffs were not responsible for delays occasioned by causes beyond their control, and that any losses of defendants in consequence thereof could not be set off against the price of the pipe, are unobjectionable when they appear, by the connection in which they were delivered, to be plainly limited to the duty of the plaintiffs under their own version of the contract.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 353 January Term 1888, Sup. Ct.; court below, No. 691 January Term 1886, C. P. No. 4.

On September 19, 1886, an amicable action between Richard Wood and others, partners trading as R. D. Wood & Co., plaintiffs, and R. J. Malone and R. B. Malone, partners trading as R. J. Malone & Brother, defendants, was entered in the court below, the plaintiffs declaring in assumpsit for goods sold and delivered, and the defendants pleading non-assumpsit, set-off, payment with leave, etc. By agreement of the parties the cause was referred to *Mr. Francis Rawle* as referee under the act of June 16, 1836, P. L. 717. On December 14, 1886, the referee reported, awarding to the plaintiffs the sum of $6,423.57. Afterwards, upon exceptions filed, the court set aside the report of the referee, and ordered that the cause be proceeded with according to the usual course prescribed by law.

At the trial on November 1, 1887, the following facts were shown: The defendants were the contractors for the construction of a section of what is known as the intercepting sewer,

running along the canal on the east bank of the Schuylkill river at Manayunk, in the city of Philadelphia, which was being built for the city and under the supervision of its engineer. The sewer was to be made of iron pipe, forty-two inches in diameter, cast in accordance with specifications furnished by the city engineer.

On October 20, 1885, the plaintiffs, in pursuance of a request that they should make a bid for furnishing the pipe required for the sewer, sent the following letter to R. A. Malone, the father of the defendants and their agent: "Dear Sir:— We will make you the 42 in. and 12 in. pipe for the intercepting sewer work and deliver same free on board Pennsylvania Railroad cars at Manayunk for $8,800, or free on board boat on canal at Manayunk at $8,950, in the event of navigation being open at time of shipment. The amount of pipe is as follows, . . . ."

A few days after the date of this letter, Mr. Murphy, the agent of the plaintiffs, met R. A. Malone and R. B. Malone in Philadelphia, and after some conversation a contract was there closed by which the plaintiffs should furnish the pipe to the defendants. The testimony for the defendants tended to prove that the contract bound the plaintiffs to ship the sections of pipe by the Schuylkill canal, and deliver them on the ground at Manayunk before the close of navigation for the current season. The testimony for the plaintiffs, on the other hand, tended to show that they did not make an absolute engagement to deliver by water, but that their undertaking respecting delivery was simply to push the work of manufacturing the pipe as rapidly as possible, and, if navigation remained open when it was completed, to deliver it by canal; and that they declined to guarantee that any of the pipe would be delivered by water, for the reason that navigation sometimes closed upon the canal as early as the first of November.

Some time between November 7, and November 10, 1885, R. A. Malone was at the office of the plaintiffs and there had an interview with Walter Wood, a member of the plaintiff firm, upon the subject of the time at which the plaintiffs could commence making deliveries. In consequence of this interview the plaintiffs on November 12, 1885, wrote to the defendants as follows: "Gentlemen: We have carefully gone over our

arrangements for making your 42 in. pipe, and will put them in work next week, and by Monday the 23d inst., will be making 4 per day, and will continue at that rate until the job is complete, which will give you 120 by Christmas. As fast as we have a lighter-load made, they will be forwarded, so that you will receive the first lot about the first of next month, and the rest regularly thereafter."

The first delivery, however, did not take place until December 23, 1885, when twenty pieces of pipe were sent by canal. About two days after that, the canal closed for the winter. On December 31st, having received from the city engineer specifications covering a larger number of pieces than the defendants had ordered, the plaintiffs wrote to the defendants the following letter: " Gentlemen: We have received to-day from Mr. J. Milton Titlow, a schedule of requirements for the intercepting sewer, representing full amount of work to be done this winter, which is as follows: . . . . .

" Please certify to the correctness of this increase of order, and also instruct us about future shipments of 42 in. pipe, and whether we can ship you another boat-load, or whether all will have to go by rail."

The defendants' response to this communication was written and signed on the same paper, below the letter, and was in these words: " We certify that the above order is correct, and desire the remainder of the pipe shipped by the Reading railroad to their freight yards at E. Manayunk, as the water is drawn from the canal."

This direction to ship by rail was written by R. J. Malone, the senior member of the defendant firm, who testified that at the time of writing it he had not been informed that the contract, as finally agreed upon between his father and brother and the plaintiffs, required the latter to deliver by water, and did not know that they had broken their contract; and that the only thing he then knew about the terms of contract was derived from seeing the alternative proposition contained in the plaintiffs' letter of November 12, 1885; that during the construction of the sewer, which he personally superintended, the witness was not informed at any time by his father and brother, that the contract with the plaintiffs was for delivery by water alone, and he first learned this about the beginning

of May, 1886; that his interpretation of the letter of December 31st., at the time of receiving it, was that the plaintiffs desired to know whether the pipe should be shipped by the Reading or by the Pennsylvania railroad.

The plaintiffs shipped the remainder of the pipe by the Reading railroad as directed. After the deliveries had been completed, several letters passed between the parties with relation to the balance due for the pipe. On May 12, 1886, in reply to a letter from the plaintiffs to defendants dated May 3, 1886, asking prompt payment of said balance, the defendants wrote as follows:

" GENTLEMEN : In reply to yours of the 3rd inst., we submit the enclosed bill representing the cost of hauling and handling 100 42 in. pipe, owing to your failure to deliver them by water as per agreement. In a letter received from you dated November 12, 1885, you state that you have 'carefully gone over our arrangements for making your 42 in. pipe and will put them in work by next week, and by Monday the 23rd inst. will be making 4 per day and will continue at that rate until the job is completed, which will give you 120 pieces by Christmas,' etc. Navigation was open up to that time ; there was nothing to prevent the fulfilment of the agreement, and yet but 25 were ready for delivery. This letter was written in response to father's urgent demand that some fixed date be specified for the delivery of the pipe by water, and after he had explained in detail the difficulty, almost impossibility, of handling the pipe delivered by rail. He informed you of his intention to order the pipe elsewhere and would have done so had he not relied upon the terms of the above quoted letter. The cost and trouble to us through your failure to comply with its terms were much greater than shown in our bill. There were 4 pipe broken in course of delivery, not handling, which were valueless to us. We are also experiencing a great deal of difficulty in obtaining our money from the city, owing to the fact that 4 of the pipe in position have broken. Two of these we replaced at our own cost, but refused to go further, as we had already exceeded the requirements of our contract. Please notify us whether the inclosed bill will be deducted from the amount we owe you."

This letter of May 12, 1886, was the first notice or sugges-

tion to the plaintiffs, as was alleged, that they had failed to keep their contract.

Upon the trial the defendants showed that the cost to them of handling the pipe was very considerably increased by their delivery at the railroad station, over what it would have been had they been delivered on the canal, and claimed to recoup the additional expense thus incurred from the plaintiffs' demand. In order to explain why the deliveries of pipe were delayed until after the close of navigation on the canal, when shipment by water was impossible, Walter Wood, one of the plaintiffs, was asked, while testifying on their behalf, to state what prevented the realization of the expectations expressed in the letter of November 12, 1885, as to the time when the plaintiffs would be able to deliver.

Objected to by the defendants.

By the court: Objection overruled; exception.[1]

This witness and John Graham, the plaintiffs' superintendent, then testified that it was found impossible to make the pipe in accordance with the engineer's specifications, as they would invariably crack in cooling, the proportionate thickness of the body and the heads being such that the former would cool so much more rapidly than the latter as to produce a strain the pipe could not stand; that it required some time and experiments to demonstrate just what the trouble was, and then it became necessary to demonstrate it to the city authorities and obtain their permission to change the specifications, and this permission was not given until about the middle of December; that the delay thus occasioned, when added to the time which before that had necessarily been consumed in preparing the fixtures required by the plaintiffs for the manufacture of this unusual size of pipe, rendered it impossible for the plaintiffs, using diligence to perform their contract, as they did, to make deliveries any earlier than the dates at which they did deliver. There was testimony, also, that some delay was occasioned by a dispute between the canal company and the city as to the right of way for the sewer, and an interference by the former with the unloading of the first shipment of pipes along the canal.

At the conclusion of the testimony the court, WILLSON, J., charged the jury in part as follows:

The contract in this case is the point about which the controversy principally turns. What was the contract? This is the first question for you to take up, and is the first question for you to settle. You have nothing to do with any question of damages, until you have settled this question as to what the contract was. If you shall, upon an honest consideration of the testimony come to the conclusion that the contract was what the plaintiffs claim it to be, that it was a contract which bound them to deliver by water as long as it was practicable, as long as navigation was open, and that then they had the right to deliver by rail, and that they discharged their duty under such a contract, then that is an end of the case and your verdict should be for the plaintiffs for the full amount of their claim. [If on the other hand their contract was to deliver by water and water only, and then by their own fault, not by reason of something which they could not control, something which was impossible in its nature, failed to deliver in that way, and thereby the defendants suffered loss, then the defendants would have a right of set-off against the plaintiffs' claim,] [2] for the amount of such loss which they suffered, for that loss or that damage which was naturally to be anticipated under the circumstances.

The contract was not in writing. There was a letter written on October 20, 1885, by the plaintiffs to the defendants, in which they made a certain proposition. That letter, I say, does not contain the contract. It may possibly have some bearing upon the question as to what the contract was, taken in connection with the oral testimony. That was a proposition on their part to furnish certain pipe, either delivered by rail or delivered by water as long as navigation was open, then afterwards by rail. It appears therefore that that thought or question of the possibility of water delivery was in the minds of the parties at the very inception of this transaction; and I may say, here, that there is no question but that it was considered from the outset between the parties as a matter of advantage to the defendants that the delivery should be by water. There is no question but what it would have been a practical advantage for them. There is no question whatever but that this was known to the parties at the time they were bargaining with each other.

The plaintiffs made their proposition on the 20th of October.

That was answered at once or after a few days, I don't remember that the number of days was fixed in the testimony, when, as the witness Murphy says (I am not giving the very words but endeavoring to give the substance of the testimony), he met them and had a conversation with them. They said that they wanted the delivery by water. Then Mr. Murphy testified that he said to them, we cannot agree to deliver by water; we cannot bind ourselves to deliver by water, because sometimes the river Schuylkill is closed by ice very early,—I think he put it as early as the first of November,—and we have got to make our preparations to cast these pipes; therefore we cannot safely or with propriety enter into a bargain of that kind; we will deliver by water just as long as navigation is open and afterwards by rail. The plaintiffs say that is what their contract was.

On the other hand the defendants say, Mr. R. A. Malone, the father, and one of the sons, who was present at the Girard House, if I remember correctly, at the time of the conversation, they say that there was a distinct agreement that the pipes were to be delivered by water, and that the bargain was made upon no other terms than those.

Now, gentlemen, that is a question you have got to settle and it is the first question to be taken up and decided. . . . .

It is claimed on the part of the plaintiffs that a letter which was written by the defendants, or one of them, in the firm name, on December 31st, instructing the plaintiffs to deliver after that date, by rail, is an entire waiver of any claim, or a waiver of any delivery in any other way than that designated in the note. I cannot so instruct you, gentlemen, as a matter of law. I do not so regard the effect of that writing. Of course, if any convenience of the defendants at the place where they were working at the time, or any reason arising from their desire to prosecute that work in a particular way, had moved them to request that delivery at any other point than that originally designated in the contract, as they stated it to be, why that would have been a waiver and would have released the plaintiffs from their obligation to deliver it at another point. If that was the nature of the notice, the plaintiffs would have been right in their contention as to the effect of the note. But I do not regard it of that sort. Navigation

had, in point of fact, closed at or about that time, or within a few hours at any rate. The note of instruction itself stated that the reason why it was given was because navigation was closed. . . . .

Now something has been said in regard to the delays which took place in the making and delivery of this pipe. The plaintiffs, under their own version of the contract, were undoubtedly bound, not only to deliver by water, so long as navigation should remain open, but to make reasonable speed with the deliveries. They were aware of the fact that the defendants had a contract with the city and of the fact that prompt deliveries of the pipe were needed; and Mr. Murphy said that they bound themselves to get to work, and to work promptly and industriously for the purpose of delivering them. If there was any needless, unnecessary or unreasonable delay on their part, whereby they were prevented from delivering these pipes by water, during the season before navigation closed, then they were guilty undoubtedly of a breach of the contract, for which the defendants could hold them responsible, to the extent that they suffered loss in consequence. These parties seem to have understood, and from the evidence found, about which there is no dispute, it seems to have been necessary for the plaintiffs to get in readiness to make this pipe, because the pipe was of a special size. They had to make their preparations to construct them, to get their patterns ready, and do everything necessary in order that the pipe might be made. Now they say they went to work with reasonable speed. That is what they claim. They say that they did cast the pipe, according to the model or specifications given to them by the city official, and cast about fifty of them, when they found, as Mr. Graham said substantially, that it was practically impossible to make them acccording to the model, that the head was too large for the body of the pipe, which in cooling would cool more quickly than the thicker heads, thereby making cracks, so that the pipes would not be serviceable, and that, therefore, they had to have new specifications. They also say that there was another ground of delay, arising from difficulties which occurred at the place where the pipe was laid, difficulties which, as described by one of the witnesses, occasioned the calling in of policemen to prevent interference of the prosecution of the

work. They claim that delayed them some time. [Of course if the delay was owing to circumstances beyond their control, which arose out of the nature of the case, by the pipes as originally provided for by the city officers being such that they could not construct, or that it was impossible for them to construct, and if there were other delays, such as have been referred to, arising in the prosecution of the work, so that the defendants were not ready to receive the pipes, then to that extent the plaintiffs would be excused for non-delivery of the pipes, just as long as those causes operated.] [3]

They were undoubtedly bound to use reasonable and proper diligence to overcome those obstacles; and it is only in case they did so that they can be regarded as observing the contract which Mr. Murphy said he entered into with the defendants. [If those obstacles prevented them, to that extent they must have a margin of time allowed; and if, by reason of those obstacles they were prevented from delivering the pipes while navigation was open, then they would be relieved from liability on that score, even though their contract was that they were to deliver by water, and even though the defendants suffered a considerable loss by reason of the pipes not being delivered by water.] [4]

I have said if you find that the contract was that the delivery should be by water only, so long as navigation should be open, and that the plaintiffs observed this contract, you have nothing whatever to do with the question of damages which the defendants suffered, because in that case the plaintiffs would not be responsible for them, and your verdict should be for the plaintiffs. On the other hand if you are of the opinion that the contract was that the plaintiffs should deliver by water and water only, that that was their contract, and that they were not excused by any such unavoidable circumstances as I have referred to, then you will have to consider what the defendants are entitled to set off against their claim. . . . . .

This subject of damages, as I have already said to you, does not arise unless you are of the opinion that the plaintiffs bound themselves to deliver by water and water only, or were not excused by such circumstances, as I have referred to, from delivery in that way. If you shall think that they were bound to deliver by water and water only, or were not excused in

that manner, for any delay, then the defendants will be entitled to set off against the plaintiffs' claim whatever you shall think, upon consideration of all the testimony in the case, the expenses amounted to, which properly falls upon that portion of the contract which the plaintiffs entered into, upon the theory that they were bound to deliver by water navigation, before the end of the season.

The jury rendered a verdict in favor of the plaintiffs for $6,740.87. A rule for a new trial having been discharged, and judgment entered on the verdict, the defendants took this appeal, assigning for error:

1. The admission of the plaintiffs' offer.[1]

2–4. The parts of the charge embraced [ ] [2 to 4]

*Mr. Thomas R. Elcock*, for the appellants:

1. The weight of the testimony was overwhelmingly in favor of our claim that the contract was to deliver by water alone; and it is to be presumed that the jury would have found in the defendants' favor but for the charge of the court to the effect that, even if such was the case, the defendants were not entitled to any damages, if the delay in delivery was occasioned by the change in the mode of construction made by the city engineer. But the plaintiffs, in undertaking to manufacture the pipe, subject to the specifications of the contract between the defendant and the city, assumed all the risk of such a change. The delay, however, was unreasonable and evidently due to neglect by the plaintiffs.

2. In accepting a delivery at a time and in a mode different from those contracted for, the defendants did not waive their right to damages for the plaintiffs' breach of the contract, or give any evidence of their intention so to do. The acceptance was the best they could do, in the circumstances, in view of their contract with the city. The law does not declare it a waiver: Hare on Contracts, 547, and cases cited; Sedgwick on Damages, *216. In New York, where this would have been regarded as an entire contract, the plaintiffs could not have recovered at all for their partial performance: Champion v. Rowley, 13 Wend. 258; s. c. 18 Wend. 187; Paige v. Ott, 5 Den. 406; Smith v. Brady, 17 N. Y. 173 (72 Am. Dec. 442); Leavenworth v.

Packer, 52 Barb. 132; Flood v. Mitchell, 68 N. Y. 507; Lee v. Beebe, 13 Hun 89.

3. The legal question presented by the exceptions is, whether, when a contract is made for the delivery of an article in a certain time, anything can excuse a failure of performance as to time, except the act of God, or a release from the other party. The position of the court below that if there was an obstacle to the performance in time which the plaintiffs " could not control," they were excused, is not the law: Jones v. St. John's College, L. R. 6 Q. B. 115; Thron v. Mayor of London, L. R. 9 Exch. 163; Taylor v. Caldwell, 3 B. & S. 826; Trustees v. Bennett, 3 Dutch. 513; Dennott v. Jones, 2 Wall. 1; Myers v. Drake, 10 W. 110; Miller v. Phillips, 31 Pa. 218; Becker v. Smith, 59 Pa. 469; Lovering v. Coal Co., 54 Pa. 291.

*Mr. Richard C. Dale* and *Mr. Samuel Dickson*, for the appellees:

1. If any one had reason to complain of the rulings of the court below, it was the plaintiffs. The defendants' counsel succeeded in satisfying the court that the letter directing the plaintiffs to ship by the Reading railroad was to be treated as the action of a purchaser, who, through breach of contract on the seller's part, found himself in a position where the only thing he could do was to accept pro tanto a partial performance of the contract. But such is not its nature. If the plaintiffs were bound to deliver on the canal bank, there was nothing in the fact that navigation had closed to prevent their doing so. The letter was a clear case of a voluntary substitution of one place of delivery for another. The plaintiffs were therefore entitled to have the entire counter claim of the defendants excluded from the consideration of the jury, and hence if there were any technical errors in any portion of the charge, such errors did the defendants no harm.

2. It is entirely unnecessary to discuss abstractly the law as to what degree of impossibility will relieve a contracting party from performance of a contract he has made. The portions of the charge assigned for error did not relate to the question of excusing the plaintiffs from performance of any definite contract by reason of delays caused through imperfect specifications, but related to the question whether in the performance of their con-

tract, as they claimed it to be, they had exercised due diligence in view of the circumstances. The court ruled that even on the plaintiffs' version of the contract, the claim of the defendants for damages might be maintained, if there was unreasonable delay on the part of the plaintiffs. The plaintiffs therefore had the right to explain the cause of the unexpected delay by the evidence as to defects in the specifications, and it was proper to charge the jury that delay thus caused did not import a want of diligence on the part of the plaintiffs.

OPINION, MR. JUSTICE McCOLLUM:

It is not surprising that the jury found the contract as claimed by the plaintiffs, and returned a verdict for the price of the pipe, with interest. The basis of the contract was the written offer of the plaintiffs under date of October 20th, and that proposed to deliver the pipe "free on board Pennsylvania Railroad cars, at Manayunk, or free on board boat on canal, at Manayunk, in the event of navigation being open at time of shipment." An acceptance of this offer, and an election to receive the pipe by water, would have created such a contract as the plaintiffs understood they had with the defendants. The delivery of the pipe was in conformity with the written offer, except that, at the request of the defendants, transportation by the Reading railroad was substituted for transportation by the Pennsylvania railroad. The specifications for the pipe were furnished by the city engineer, and, as it was of unusual size, it was known that considerable time would necessarily be consumed in the preparation of the flasks and fixtures required for its manufacture. It was known, also, that navigation in the Schuylkill river was sometimes closed by the 1st of November, and for this reason the plaintiff's offer to deliver the pipe by water was upon the condition that navigation was open at the time of shipment. During the months of December, January, and February the defendants made no complaint of delays in the delivery of the pipe. They accepted it by rail, without an intimation to plaintiffs that they were entitled to a water delivery, or that the contract had been broken. When the plaintiffs' bill for the price of the pipe was rendered, they promised to pay it, without suggestion of any claim for damages arising from a breach of contract. The senior member of

the defendant firm admits that he understood the contract to be as claimed by the plaintiffs. He says: "I never saw any contract, except the alternative one by water or rail. I knew I had a contract. I knew it was an alternative contract." He says, further, that neither his partner nor his father suggested to him that the delivery of the pipe was not according to the contract, until nearly three months after it was completed; and yet he was actively engaged in the superintendence of the work and in the removal of the pipe from the railroad cars to the canal, where it was used in the construction of the sewer. This brief recital of facts, which are either admitted or undisputed, presents some of the salient features of the case, and some of the obstacles opposed to the defendants' claim that the contract was for the delivery of the pipe upon the canal bank, at Manayunk, before the close of navigation for the year 1885.

The first specification of error is without merit. The letter of November 12th was no part of the contract between the parties. It was written in response to a request of the defendants to know what progress was being made in the manufacture of the pipe, and when deliveries of it might be looked for. It was based on information received by the plaintiffs from the men in charge of the work at their foundry, and it expressed their expectations in the matter to which it referred. These expectations were disappointed, and delay was occasioned by the discovery of defects in the specifications furnished by the city engineer which made new specifications necessary. It was proper to show this in explanation of the delay.

A single sentence from the charge constitutes the second specification of error. While it is possible that a nice criticism might discover technical inaccuracy in it, standing by itself and applied to a contract in which time is made material by the agreement of the parties, when we consider it in connection with the whole charge and the evidence in the case, we are not convinced that it is substantial or reversible error. If the defendants desired specific instructions on the point which they now seek to raise by this specification, they should have asked for them, and, as they did not, they cannot now successfully complain of an omission to state the nature and cause of the impossibility which will excuse a failure to perform a contract within the time stipulated.

Statement of Facts.

The third and fourth assignments may be considered to-gether. They are founded upon portions of the charge which refer to the delay caused by the defective specifications, and by the failure of the defendants to promptly unload the pipe at Manayunk. These excerpts appear in that part of the charge in which the duty of the plaintiffs, under their own version of the contract, is considered. When read in their proper connection, they are plainly applicable and limited to that contract, and have no reference to a contract for water delivery only. Thus applied, they correctly define the rights and duties of the parties, and are unobjectionable. A careful review of this record has satisfied us that there is no substantial error in it, and therefore

The judgment is affirmed.